SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
RICHARD J. SIMMONS, Cal. Bar No. 72666
DEREK R. HAVEL, Cal. Bar No. 193464
GEOFFREY D. DEBOSKEY, Cal. Bar No. 211557
LAUREN D. THIBODEAUX, Cal. Bar No. 239997
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
Telephone: 213-620-1780
Facsimile: 213-620-1398
rsimmons@sheppardmullin.com
dhavel@sheppardmullin.com
gdeboskey@sheppardmullin.com
lthibodeaux@sheppardmullin.com

Attorneys for Defendant KELLY
SERVICES, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHERINE E. SULLIVAN, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>KELLY SERVICES, INC., and DOES 1 TO 10, inclusive,<br><br>        Defendants. | Case No. CV 07-02784 CW (BZ)<br><br>[Compliant Filed April 20, 2007]<br><br>**DECLARATION OF LAUREN D. THIBODEAUX IN SUPPORT OF DEFENDANT KELLY SERVICES, INC.'S OPPOSITION TO PLAINTIFF CATHERINE SULLIVAN'S MOTION TO MODIFY CASE MANAGEMENT ORDER AND AMEND COMPLAINT**<br><br>Date:     August 14, 2008<br>Time:    2:00 p.m.<br>Judge:   Hon. Claudia Wilken<br>Courtroom.: 2, 4th Floor |

-1-

## DECLARATION OF LAUREN D. THIBODEAUX

I, Lauren D. Thibodeaux, declare as follows:

1.     I am an attorney licensed to practice law in all the courts of the State of California.  I am an associate with the law firm of Sheppard, Mullin, Richter & Hampton LLP, attorneys of record for Kelly Services, Inc. ("Kelly") in the action entitled <u>Catherine E. Sullivan v. Kelly Services, Inc.</u>, U.S.D.C. Northern District Case No. CV 07-02784 CW (BZ). The following facts are based on my personal knowledge and if called and sworn to testify as a witness I could and would competently testify thereto.

2.     I am in possession of a certified copy of the deposition transcript of plaintiff Catherin E. Sullivan ("Plaintiff").  True and correct copies of relevant excerpts from this transcript are attached hereto as Exhibit "A."

3.     At Plaintiff's deposition, she authenticated the Agreement that she signed when she applied for Employment with Defendant Kelly Services.  A true and correct copy of this Agreement is attached hereto as Exhibit "B."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed July 24, 2008, at Los Angeles, California.

Lauren D. Thibodeaux

-2-

THIBODEAUX DECL. IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION TO MODIFY CASE MANAGEMENT
STATEMENT AND AMEND COMPLAINT

# EXHIBIT "A"

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CATHERINE E. SULLIVAN, on )
behalf of herself and all )
others similarly situated, )
)
    Plaintiffs, ) No. CV 07-02784 CW
)
       vs. )
)
KELLY SERVICES, INC., and )
DOES 1 to 10, inclusive, )
)
    Defendants. )
_____ )

V O L U M E   I

DEPOSITION OF CATHERINE ELIZABETH SULLIVAN

OCTOBER 29, 2007



ABRAMS, MAH & KAHN
R E P O R T I N G   S E R V I C E

Reported By:  Deborah L. Lubin
         CSR No. 3234

File No.:  25210

4101 Birch Street • Suite 130
Newport Beach • California 92660
949-261-8686 • 800-622-0226

3

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4

5    CATHERINE E. SULLIVAN, on
     behalf of herself and all
6    others similarly situated,
                                        No. CV 07-02784 CW
7             Plaintiffs,

8       vs.

9    KELLY SERVICES, INC.,
     and DOES 1 to 10, inclusive,
10

11            Defendants.
     _____  /
12

13

14                  V O L U M E   I

15    Videotaped deposition of CATHERINE ELIZABETH SULLIVAN,

16    taken on behalf of Defendant, at Four Embarcadero

17    Center, 17th Floor, San Francisco, California,

18    commencing at 10:07 a.m., Monday,  October 29, 2007,

19    before Deborah Lee Lubin, CSR No. 3234, RPR, CRP.

20

21

22

23

24

25

                   Abrams, Mah & Kahn

                          1

1    at Kelly Services?

2        A.    Yes.

3        Q.    Did you talk to Pilar more than once about

4    working at Kelly Services?

5        A.    Not that I recall.                              10:36

6        Q.    Anything else you can recall Pilar telling you

7    about working at Kelly Services?

8        A.    No.

9        Q.    Before going to Kelly Services, had you ever

10   worked for a temp placement agency?                       10:37

11       A.    No.

12       Q.    And does it sound correct that you filled out

13   an application to begin working at Kelly Services in

14   February of 2006?

15       A.    Yes.                                             10:37

16             What did I say "yes" to?  What was the

17   question?

18       Q.    Whether it sounded accurate that you began

19   working at Kelly Services in February of 2006.

20       A.    I read the -- I read what you have in your      10:37

21   hand.  I think it said 2/28/2006, signed at the bottom?

22       Q.    When you say you read what I have in my hand,

23   I'll show it to you and you can look at it.

24             When did you read what I have in my hand?

25             Which I am going to mark as Exhibit 1.  This is  10:38

1      A.   I worked as a temporary employee for Managed

2  Health Network.

3      Q.   Okay.

4           And this was the position that Kelly placed you

5  in, correct?                                                    10:50

6      A.   Yes.

7           MR. HAVEL:  I will mark the next document as

8  Exhibit 2.

9           (Whereupon, Exhibit 2 was marked for

10          identification.)                                       10:51

11          (Witness reviews document.)

12          BY MR. HAVEL:

13     Q.   This is a one-page document entitled "Kelly

14  0065."

15          Is this a copy of a resumT that you submitted          10:51

16  to Kelly Services?

17     A.   It appears to be.

18     Q.   All right.

19          And is all the information on this document

20  accurate?                                                      10:51

21     A.   This appears to be correct.

22     Q.   Do you remember who you gave this document to?

23     A.   No.

24     Q.   Do you remember how you gave this document to

25  Kelly Services, whether it was in person or you faxed          10:52

1    Q.    Okay.

2    A.    I don't know exactly who did that.  I would

3    assume it would be me.  I don't know.

4          Then under Kelly 0056 "Certifications and other

5    credentials," that's my handwriting.  "Language,"          11:00

6    there's nothing written there.  "Preferences," that is

7    my handwriting.

8    Q.    Okay.  Thank you.

9          Now, does reviewing this document refresh your

10   recollection as to whether you spoke with Lisa Galetto     11:00

11   about any other items?

12   A.    What does "item" refer to?

13   Q.    Anything that might be on this document.

14         I'm just asking if this refreshes your

15   recollection as to anything that you and Lisa talked       11:00

16   about.

17   A.    No.

18   Q.    Okay.

19         Directing you to the second page of this

20   document, Kelly 0054, there's an "Agreement" section in    11:01

21   the second half of this page.  And that is your

22   signature above the signature line, correct?

23   A.    Yes.

24   Q.    And then you printed your name beneath that?

25   A.    Yes.                                                  11:01

**Abrams, Mah & Kahn**

44

1    Q.   The first paragraph under "General

2    Information."

3    A.   "General Information."

4    Q.   Yes.

5         MS. SHARPE:   Right there (indicating).                    11:02

6         BY MR. HAVEL:

7    Q.   I'll read the whole thing on the record.

8              "I understand that I may be

9    offered employment with Kelly Services

10   (Kelly) subject to my availability for          11:02

11   work, Kelly's ability to find suitable

12   positions for me and the result of

13   reference checking or other screening

14   procedures.  My employment will begin on

15   the first day of my position."                  11:03

16         Was it your understanding at the time that your

17   employment with Kelly Services -- that you were going to

18   be employed by Kelly Services as opposed to the

19   different assignments that you were going to?

20   A.   Was it my understanding I would be an employee      11:03

21   of Kelly Services?  Yes.

22   Q.   Correct.  Okay.

23   A.   Those are the terms and conditions.

24   Q.   Right.  And this agreement distinguishes

25   specifically that you will not be an employee of --      11:03

1    Do you understand the question?

2    THE WITNESS:  At the time that I signed this,

3    did I understand that?

4    MR. HAVEL:  Yes.

5    THE WITNESS:  No.                                        11:07

6    BY MR. HAVEL:

7    Q.    Do you understand that now?

8    A.    No.

9    Q.    Do you understand that Kelly Services

10   internally takes the position that the end of an          11:07

11   assignment is different than the end of employment with

12   Kelly Services?

13   A.    I don't understand.

14   Q.    Has anyone at Kelly Services ever told you that

15   just because you're ending your assignment doesn't mean   11:08

16   that you're terminated from Kelly Services?

17   A.    Yes.  Someone has said that to me.

18   Q.    And who was that?

19   A.    It was a person who answered the phone at Kelly

20   Services when I called on Monday, August 15th, 2006 and   11:08

21   inquired about my final paycheck.

22   Q.    Do you know who that was?

23   A.    Well, if you read the documents produced by

24   your law firm --

25   MS. SHARPE:  Just answer the question, Kate.             11:08

**Abrams, Mah & Kahn**

51

1     A.    Correct.

2     Q.    Did you ever work at any other assignments

3   after MHN through Kelly Services?

4     A.    No.

5     Q.    Page 4 of the Employee Handbook, the first          11:37

6   column says "Getting paid."  The first paragraph says:

7           "One of our highest priorities

8       is paying you quickly and accurately.  Our

9       goal is for you to receive your pay by the

10      Friday following the week worked."                       11:37

11          During the time that you did work at MHN

12   through Kelly Services, did you get paid the following

13   Friday of every week worked?

14    A.    No, not of every week worked.

15    Q.    When did you not get paid the following Friday        11:37

16   of every week worked?

17    A.    There were a couple of times that I did not get

18   paid at all.

19    Q.    At all?

20    A.    Correct.                                              11:38

21    Q.    What times were those?

22    A.    There was a time that Kelly Services overpaid

23   me and then deducted the money out of the following

24   paycheck without any sort of consent on my part at that

25   time, so there was zero pay.                                11:38

1    Net?

2          A.    Lisa Galetto.    Whoever the receptionist is at

3    the Lincoln Street office in San Rafael.

4          Q.    Do you remember what she told you?

5          A.    That -- I just recall that it was very rare          12:07

6    that they found an HR assignment.    I didn't know who it

7    was at the time, I don't believe, but I was to report

8    for an interview.

9          Q.    Did she tell you what the position was?

10         A.    Just that it was an HR position.    That's all I    12:07

11   recall at this time.

12         Q.    Did she tell you what the rate of pay was?

13         A.    No, not that I recall.

14         Q.    Did she tell you who you would be interviewing

15   with?                                                           12:08

16         A.    Yes.    Yes.

17         Q.    Who was that?

18         A.    Well, from having worked with them, I know I

19   interviewed with Sharene Ho and Kelly -- I don't

20   remember her last name.                                        12:08

21               MR. HAVEL:    We are going to stop the tape for

22   the deposition.    Why don't we take a five-minute break.

23               THE VIDEOGRAPHER:    This marks the end of

24   videotape number 1 in the deposition of Catherine

25   Sullivan.                                                       12:08

1          The time is 12:08 p.m.  We are off the record.

2          (Whereupon, a recess was taken from

3     12:08 p.m. until 12:17 p.m.)

4          THE VIDEOGRAPHER:  This marks the beginning of

5     tape number 2 in the deposition of Catherine Sullivan.          12:17

6          The time is 12:17 p.m.  We are back on the

7     record.

8          BY MR. HAVEL:

9     Q.    Ms. Sullivan, we are back on the record.

10         If you could just -- I mean, I guess we could          12:18

11    have the last answer read back or if you could repeat

12    the names of the two people that you met with when you

13    started at Health Net eCommerce.

14         Would you repeat those names, please?

15         Sharon --          12:18

16    A.    Sharene Ho.

17    Q.    Sharene Ho.

18    A.    And Kelly -- I can't remember her last name at

19    this time.

20    Q.    That's why there was a blank.  Okay.          12:18

21         Where did you meet with them?

22    A.    At 1600 Los Gamos, and I believe it was in the

23    conference room directly behind the receptionist's desk.

24    I believe it's the third floor.

25    Q.    And did they discuss with you the position that          12:19

1    they were looking to fill?

2        A.    Yes.

3        Q.    And what did they tell you about the position?

4        A.    As I recall, they asked about my experience.

5    And at one point Kelly described the job as not being          12:19

6    terribly payroll oriented in the sense that I would not

7    be processing payroll, but I would be dealing with

8    payroll issues.

9        Q.    So when you say "Kelly," you are talking about

10   the individual, not Kelly Services?                            12:19

11       A.    Right.  The individual, Kelly.

12            I would be handling the new hire -- scheduling

13   new hire orientation, producing materials for that,

14   ordering materials for that, supporting the supervisor,

15   Julius Schillinger.                                            12:20

16       Q.    What was Julius's position?

17       A.    He was the director of OE, organizational

18   effectiveness.

19       Q.    Was that a human resources position?

20       A.    Yes.  That's what they called their HR            12:20

21   department there, was organizational effectiveness.

22       Q.    Okay.

23            And what was your title?

24       A.    Organizational effectiveness specialist.

25       Q.    Did you report to anyone other than Julius?      12:20

13

```
 1        Q.   -- temp agencies paid a final paycheck at the

 2   end of each assignment?

 3        A.   No.

 4        MR. HAVEL:  I am going to mark the next

 5   document as Exhibit 7.  This is a one-page document          12:54

 6   Bates stamped Kelly 0044.

 7             (Whereupon, Exhibit 7 was marked for

 8             identification.)

 9             (Witness reviews document.)

10        BY MR. HAVEL:                                           12:55

11        Q.   I will just ask you if this refreshes your

12   memory at all with regard to a potential assignment for

13   Wells Fargo Bank.

14             Was there at some point a potential assignment

15   for Wells Fargo Bank?                                        12:55

16        A.   I spoke to Baker about a position -- a temp

17   position.

18        Q.   Okay.

19             And do you know the first name of Baker?

20        A.   Brian, maybe?                                      12:55

21        Q.   And do you know what office Brian Baker is at?

22        A.   He's one of -- I think there's maybe one or

23   more San Francisco offices.

24        Q.   But he was based out of San Francisco?

25        A.   Yes.                                               12:55
```

1    Q.   Do you remember when you first heard about a

2  potential assignment at Wells Fargo Bank?

3    A.   Do I recall when?

4    Q.   Yes.

5    A.   It was after I was laid off due to lack of          12:55

6  work.

7    Q.   How far --

8    A.   Sent home.

9    Q.   After your last assignment?

10    A.   Yes.                                                12:56

11    Q.   How far after this -- for reference, this

12  document indicates it was created on August 18, 2006.

13    A.   Okay.

14         So I don't -- I personally don't recall the

15  dates.  I just remember after -- when I was unemployed,   12:56

16  I spoke to Baker about a position in San Francisco.

17    Q.   And do you recall, was that within a week after

18  the last day of your assignment, two weeks?

19    A.   I personally don't recall.

20    Q.   Okay.                                               12:56

21         Is it fair to say that it could have been

22  within a week?

23    A.   Well, you're basing that based on this

24  document.

25    Q.   I am.                                               12:56

1    A.    Right.

2    Q.    And I'm asking you what your recollection is.

3    A.    I don't recall.

4    Q.    It could have been six months after?

5    A.    No.  It would have been like within the first    12:56

6    few weeks of unemployment.

7    Q.    Okay.

8          That's what I'm trying to establish.

9    A.    Okay.

10    Q.    Do you remember what Mr. Baker told you about    12:56

11    this position at Wells Fargo Bank?

12    A.    No.

13    Q.    Do you remember the title of the position?

14    A.    No.

15    Q.    The site name is Wholesale University.    12:57

16          Do you remember --

17    A.    It's on like Harrison and 2nd area, very close.

18    Q.    What is Wholesale University?

19    A.    It's a division of Wells Fargo Bank, and it has

20    to do with -- I think it's where they go to universities    12:57

21    and try to sign people up for credit cards.  I don't

22    know.

23          Oh, I know what it is.  That's wrong.

24          It has to do with the training of Wells Fargo's

25    -- oh, yeah.  They have these managers.  They bring in    12:57

16

1        So it wasn't actually doing any recruiting.  It

2    was supporting the recruiting staff in their efforts to

3    get students to sign up for this program.

4        Q.   Did Baker tell you about this part of the

5    position?                                                12:59

6        A.   No.  I went to two interviews.

7        Q.   Okay.

8             Do you remember who you interviewed with?

9        A.   Some woman with dark hair.  I think I

10   interviewed with her and then someone else I can't       12:59

11   remember.

12       Q.   Was it at the Wholesale University site?

13       A.   Yeah.  That's the department of Wells Fargo.

14   It is the Wells Fargo that's not accessible to

15   customers.                                                01:00

16       Q.   Do you recall when you had these interviews?

17       A.   August, September.  Late August, maybe early

18   September, 2006.

19       Q.   Why did you have -- did they call you back

20   after the first interview for a second interview?         01:00

21       A.   Yeah, I think Jason called me back.  Jason.  I

22   mean, Brian Baker.  Maybe it's Jason Baker.  I don't

23   know.  Baker called me back.  It was a "B" Baker.  He

24   contacted me and said they wanted to do a second

25   interview, as I recall.  So you'd be dealing with the     01:00

1    Kelly Services rep through the interview processes.

2        Q.   Right.  Brian Baker in this situation.

3        A.   Brian, yeah.  I think it's Brian.

4        Q.   Did he tell you who was going to be your second

5    interviewer?                                                     01:01

6        A.   I think it was the same person.  It was the

7    same woman as the first time.  I think maybe I

8    interviewed with someone else, too.  And that was the --

9    that was the time I learned really what the position was

10   about.                                                          01:01

11       Q.   And did you ultimately get offered the

12   position?

13       A.   Brian called -- or whoever it was -- Baker

14   called and said they wanted to hire me.

15       Q.   Again, this was in the August-September time         01:01

16   frame of --

17       A.   Yes.

18       Q.   -- 2006?

19            "Yes"?

20       A.   Yes.                                                  01:01

21       Q.   Okay.

22            And what did you say?

23       A.   Once I found out what the duties were, I felt

24   that I was overqualified for the position.  It wasn't

25   going to be challenging.  I have a bachelor's degree in       01:01

1    HR management.  Mailing fliers and things like that is a

2    support staff position.

3            And I think it was a temp-to-hire position,

4    actually.  I can't remember.  But also the pay was not

5    as much as I made at MHN.  And considering the commute,    01:02

6    parking, gas, you know, bridge toll, I felt like I

7    couldn't afford it.  It would be costing me money.

8        Q.   And before you went on these interviews at

9    Wells Fargo Bank, you did not have to fill out any new

10   hire paperwork for Kelly Services, correct?    01:02

11       A.   Not that I recall.

12       Q.   And before Baker told you that Wells Fargo

13   wanted to hire you, he didn't tell you that you'd have

14   to fill out any new hire paperwork before starting at

15   Wells Fargo, did he?    01:02

16       A.   No, he did not say that.

17       Q.   Did you tell him in that phone conversation

18   that you wanted to -- that you didn't want the position?

19       A.   I think we -- the second call he made I stated

20   that that wouldn't be an appropriate position for me.    01:03

21           I think I filed for unemployment during that

22   time since I wasn't receiving any sort of wages from

23   Kelly Services.  My source of income was the

24   unemployment department.

25       Q.   Did you have another job that you were working    01:03

**Abrams, Mah & Kahn**

129

1          "The client would like KE to

2     attend second interview at site on 8/30 at

3     10 a.m."

4          Does that sound accurate to you?

5          Do you want to look at the document?                01:12

6     A.    It might -- if there was a second interview.  I

7     remember going for a first interview and a second

8     interview.

9          MR. HAVEL:  I will just mark this as Exhibit 11

10    to be consistent.                                         01:12

11         (Whereupon, Exhibit 11 was marked for

12         identification.)

13         (Witness reviews document.)

14         BY MR. HAVEL:

15    Q.    Again, this doesn't refresh your memory as to      01:13

16    the timing of when the second interview --

17    A.    No.

18    Q.    -- took place?

19         Is that a "no"?

20    A.    No.                                                 01:13

21         MR. HAVEL:  Do you want to go off the record

22    for one second?

23         THE VIDEOGRAPHER:  The time is 1:13 p.m. and we

24    are off the record.

25         (Whereupon, a recess was taken from               01:13

1          WITNESS DECLARATION

2

3          I declare under penalty of perjury under the

4    laws of the State of California that the foregoing is

5    true and correct.

6                    Executed on _____,

7    2007,  at _____, California.

8

9

10

11

12          _____

13    CATHERINE ELIZABETH SULLIVAN

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    STATE OF CALIFORNIA      )
                                              )  ss.
 2            COUNTY OF SAN FRANCISCO )

 3

 4        I hereby certify that the witness in the foregoing

 5   deposition, CATHERINE ELIZABETH SULLIVAN, was by me duly

 6   sworn to testify to the truth, the whole truth and

 7   nothing but the truth, in the within-entitled cause;

 8   that said deposition was taken at the time and place

 9   herein named; that the deposition is a true record of

10   the witness's testimony as reported by me, a duly

11   Certified Shorthand Reporter and a disinterested person,

12   and was thereafter transcribed into typewriting by

13   computer.

14        I further certify that I am not interested in the

15   outcome of said action, nor connected with, nor related

16   to, any of the parties in said action, nor to their

17   respective counsel.

18        IN WITNESS WHEREOF, I have hereunto set my hand and

19   affixed my signature this 8th day of November 2007.

20

21

22   _____

23        DEBORAH LEE LUBIN, CSR No. 3234, RPR, CRP

24

25
```

**Abrams, Mah & Kahn**

185

1                    DEPOSITION OFFICER'S COPY CERTIFICATE

2

3        STATE OF CALIFORNIA        )
                                    )   ss:
4        COUNTY OF SAN FRANCISCO    )

5

6            I, Deborah Lee Lubin, Certified Shorthand Reporter,

7        Certificate No. 3234, for the State of California,

8        hereby certify:

9            The foregoing transcript is a true and correct copy

10       of the original transcript of the proceeding taken before

11       me as thereon stated.

12

13

14       Dated  11/9/07

15

16

17

18

19

20

21       _____
                    Deborah Lee Lubin
22

23

24

25

                        ABRAMS, MAH & KAHN

**EXHIBIT "B"**

Apr. 26. 2007 4:53PM

## Background Information  *(Applicants in Hawaii: Do not complete this section until instructed to do so.)*

When completing this section, do not disclose information regarding convictions that have been judicially sealed, expunged, eradicated, impounded or dismissed. Do not disclose information regarding juvenile court convictions or minor traffic violations. A conviction record does not automatically bar you from employment. All of the job-related circumstances surrounding convictions will be considered.

1. **In the last 7 years, have you been convicted of, pled guilty or no contest to, been imprisoned, or been on probation or parole for any felony?**
   ☐ Yes   ☒ No
   *Applicants in Alaska: Do not disclose information regarding felony convictions that are more than 10 years old.*

2. **In the last 7 years, have you been convicted of, pled guilty or no contest to, been imprisoned, or been on probation or parole for any misdemeanor?**
   ☐ Yes   ☒ No
   *Applicants in Alaska: Do not disclose information regarding misdemeanor convictions that are more than 10 years old.*
   *Applicants in California: Do not disclose information regarding marijuana offenses that are more than 2 years old.*
   *Applicants in Georgia: Do not disclose any first offender discharge as described under Georgia Law.*
   *Applicants in Massachusetts: Do not disclose information regarding misdemeanor convictions or completion of any incarceration that is more than 5 years old and first convictions for drunkenness, simple assault, an affray, or disturbing the peace.*
   *Applicants in Nevada: Do not disclose misdemeanor convictions that did not result in imprisonment.*

3. **Do you have charges pending?**   ☐ Yes   ☒ No
   *Applicants in Massachusetts and Washington: Do not answer question 3.*

4. **Are you currently on probation?**   ☐ Yes   ☒ No

5. **If you answered Yes to any of the questions above, please explain completely:**

## Agreement

### General Information

I understand that I may be offered employment with Kelly Services, Inc. ("Kelly") subject to my availability for work, Kelly's ability to find suitable positions for me, and the results of reference checking or other screening procedures. My employment will begin on the first day of my first position.

The term of employment with Kelly is not guaranteed. Kelly or I may end the employment relationship at any time, with or without cause, subject to applicable laws. Thus, my employment is considered to be "at will." The length of any position I accept depends on the needs of Kelly's customer and may be canceled by Kelly or the customer at any time.

Kelly will provide me with the details of any position I accept. If the customer significantly changes the responsibilities of my position, I will promptly notify Kelly.

Kelly will pay me for my work while assigned to Kelly's customer. If Kelly overpays me, Kelly may deduct such overpayment from any proper compensation that Kelly owes me.

### Release for Reference Checks

I authorize Kelly to contact my previous employers for work-related references.

### Release for Background Screening
*Not applicable in Arizona*

I authorize Kelly to verify any information that I provide in connection with my employment. I release Kelly, its customer, its authorized representatives, and the consumer reporting agency from all liability resulting from the use of background information about me for employment purposes.

### Release of Personal Information

I authorize Kelly to collect, use, store, transfer, and purge the personal information that I have provided for employment-related purposes. Kelly's privacy statement is available to me upon request.

### Training

As a benefit to me, Kelly may offer me the opportunity to enhance my skills through training programs. These programs do not constitute an offer, promise, or guarantee of future positions. Training is strictly voluntary, and I may not be paid for time spent in training.

### Non-Disclosure/Assignment of Intellectual Property Rights Agreement

Without Kelly's prior written approval, I will not publish, use, copy, retain possession of, or disclose any proprietary or confidential information of any Kelly customer. Upon completion of the position, I will return to the customer all documents, papers, and other records that may embody confidential customer information.

In addition, I understand that the ownership of any work I create while in this position will belong to Kelly or its customer, and I will assign any intellectual property rights that arise from my work according to Kelly's request. Thus, my work while in this position will be considered "work made for hire."

### Communication and Information Systems User Agreement

I understand that communication and information systems belonging to Kelly and/or Kelly's customers (such as e-mail, Internet, Intranet, voicemail, fax machines, and the like) are intended for legitimate business purposes and that I will not be afforded any privacy when using these systems. Any use of these systems for personal business is the sole discretion of Kelly or customer management and must be used in an appropriate and reasonable manner. Access to and use of these systems may be terminated at any time without notice.

The use of communication and information systems in an inappropriate or offensive manner (including sexually explicit words or images, racial epithets or slurs, and/or demeaning words or images that may be considered offensive to others) may result in termination of my position or employment.

### Notice of Assignment End

Upon completion of each assignment, I will notify Kelly of my availability for work. I understand that I will be responsible for maintaining regular contact with Kelly and that failure to do so will indicate that I have either voluntarily quit or am not actively seeking work. Failure to contact Kelly may affect my eligibility for unemployment benefits.

### Employment Relationships

As a Kelly employee, I understand that I am not an employee of the customers to whom Kelly assigns me, regardless of any customer statement, conduct, or belief.

I acknowledge that I will not be eligible to participate in or to receive benefits from any customer's benefits plans or policies, and I waive and disavow all rights to receive them, apply for them, or participate in them.

### Statement of Understanding

I certify that I am at least 18 years of age and that I have completed this form to the best of my ability. I understand that falsification of information may lead to ineligibility for or termination of employment.

I have read this agreement; I understand it, and I agree to its terms.

Signature: *Catherine Sullivan*   Date: _____

Print Name: CATHERINE SULLIVAN

Witness Signature: *Lisa Gieletto*

Witness Print Name: Lisa Gieletto

## Disclosure Authorization  *(For applicants interested in Teaching/Education positions.)*

I authorize Kelly, any customers, students, parents, legal guardians, or legal representatives to share any information or records regarding me.

Signature: _____

Kelly 0054

2

24

<u>ROOF OF SERVICE</u>

<u>STATE OF CALIFORNIA, COUNTY OF LOS ANGELES</u>

I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 333 South Hope Street, 48th Floor, Los Angeles, California 90071-1448.

On **July 24, 2008**, I served the following document(s) described as **DECLARATION OF LAUREN D. THIBODEAUX IN SUPPORT OF DEFENDANT KELLY SERVICES, INC.'S OPPOSITION TO PLAINTIFF CATHERINE SULLIVAN'S MOTION TO MODIFY CASE MANAGEMENT ORDER AND AMEND COMPLAINT** on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

Eric A. Grover, Esq.                Tel: 415-543-1305
Valerie Sharpe, Esq.                Fax: 415-543-7861
Keller Grover LLP
425 Second Street, Ste. 500
San Francisco, CA 94107

☒ **BY ELECTRONIC MAIL:** Pursuant to USDC – Northern District's General Order No. 45.

☐ **BY FACSIMILE:** I served said document(s) to be transmitted by facsimile pursuant to Rule 2.306 of the California Rules of Court. The telephone number of the sending facsimile machine was 213-620-1398. The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list. The sending facsimile machine (or the machine used to forward the facsimile) issued a transmission report confirming that the transmission was complete and without error. Pursuant to Rule 2.306(g)(4), a copy of that report is attached to this declaration.

☒ **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the office of the addressee(s).

☒ **FEDERAL:** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **July 24, 2008**, at Los Angeles, California.

_____
Donna J. McCurdy